IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM BECKER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00886-AGF |
| | ) | |
| CITY OF HILLSBORO, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs William Becker and Darcy Lynch filed this property rights action in their capacity as co-trustees seeking damages against Defendant City of Hillsboro, Missouri (the "City") for inverse condemnation under the federal and state constitutions and violations of their constitutional rights under 42 U.S.C. § 1983. Plaintiffs allege that they have been deprived of any and all economical and productive use of their property as a result of the actions, ordinances, and regulations of the City with respect to water access.

This matter is now before the Court on cross motions for summary judgment. Doc. Nos. 35 and 38. Each side asserts there are no material issues of fact and that it is entitled to judgment as a matter of law. For the reasons set forth below, the Court will deny Plaintiffs' motion for summary judgment and grant the City's motion for summary judgment.

## BACKGROUND

For purposes of the motions before the Court, the record establishes the following. Plaintiffs are co-trustees of the Antoinette Ogilvy Trust (the "Trust"). The Trust

owns 176 +/- acres of land located in Jefferson County, Missouri (the "Property").  The
Property was purchased by Antionette Ogilvy and her husband in 1948 and title was
placed in the Trust.  It has remained vacant during the Trust's ownership.  In 2000,
Antionette Ogilvy, on behalf of the Trust, voluntarily annexed the Property into the City.
The ordinance approving the annexation states that the City has the ability to furnish
normal municipal services to the area to be annexed within a reasonable time.  When the
Property was voluntarily annexed it was zoned for residential use.  The City points out,
and Plaintiffs concede, that the annexation ordinance only states that the City has the
*ability* to provide municipal services; it does not state that such services would be
provided at the City's cost.  The Property is still currently zoned by the City for
residential use.

When Plaintiffs' mother died in 2021, Plaintiffs became trustees of the Trust.
Plaintiffs decided to try to sell the Property for development as residential lots.  Plaintiffs
originally attempted to sell the Property as a whole, but when that effort failed, they
opted to subdivide the Property into eight residential lots for development as single-
family homes.  In 2022, Plaintiffs sold one lot to Josh and Julia Brown for $233,825 and
accepted a Sale Contract for the another.[1]

Plaintiffs assert that around this time, they first learned that the Property had been
voluntarily annexed into the City in 2000, and that City ordinances prohibited any

---

[1]     Aside from the parcel sold to the Browns (Lot 8) being recorded as a plat in Jefferson
County, Plaintiffs admit that they have not recorded the subdivision of the remainder of
the Property in any way with the City of Hillsboro or with Jefferson County.  Doc. No. 46
¶ 11.

residences from being used or occupied unless they had access to a source of water.  The

first ordinance at issue was passed in 2008, which states in relevant part,

**Sec. 23-73.  Unlawful to occupy, use or live in a residential structure without water.**

> \* \* \*
> (b)    It shall be unlawful for any person to occupy, use or otherwise live in any home, mobile home, apartment, or other residential structure within the city limits of the City of Hillsboro which is not being serviced by the city water supply system or by an approved and functioning deep well.

City of Hillsboro Municipal Code Section 23-73, Doc. No. 36-4; *see also* Doc. No. 40-5.

Further, pursuant to an ordinance enacted in 1971, the City prohibits the drilling or

use of any wells as a water source on any property in the City.

**Sec. 23-71. Use of water from certain sources and other utilities.**

(a)    Drilling, digging, enlarging or deepening of water wells, or reopening of abandoned water wells withing the boundaries of the city, except by the city, and the taking of water from wells hereafter dug or drilled within the city, except by the city, is hereby prohibited.

*Id.* at Section 23-71; *see also* Doc. No. 40-4.

Plaintiffs were informed that they would be responsible for the costs of extending

the municipal water system to the Property, as opposed to the City.  The Property is

located several hundred feet from the City's water system and Plaintiffs contend that the

cost to extend the water system to each of the Property's proposed eight subdivided lots

exceeds $500,000.  Plaintiffs engaged an expert appraiser who opined that the cost to

separately run water to all of the proposed lots is between $963,000 and $1,575,000.

Doc. No. 44-3.[2]

Plaintiffs allege this excessive cost makes the development and use of the Property as residences economically unfeasible and prohibitively expensive.  Plaintiff William Becker went to the City Council on two occasions and spoke during open sessions asking that the Property be de-annexed.  Plaintiff Becker states that he went to the City multiple times and asked to be allowed to drill private wells on the Property, but was not granted a variance.  Doc. No. 40-1, 44:1-4, 61:12-14.

The City states that they are able to extend municipal services to within 20 feet of the Property from the neighboring Eagle Rock subdivision, and Plaintiffs would then be able to tap onto water line.  Doc. No. 40 at ¶¶ 29, 36.  It is undisputed that the distance from the water hook up in the Eagle Ridge subdivision to the back of the Property is 228 feet.  *Id.* at ¶ 36.  It is also undisputed that when the Eagle Rock subdivision was developed, the developer paid the costs of running approximately 3,000 feet of water main to hook the subdivision up to the City's water line.  *Id.* at ¶ 35.  The City also noted that it has had two instances in the past in which property owners outside the city limit wanted to tap onto the City's water supply, which the City permitted as long as the owners paid the costs of connection.  *Id.* at ¶¶ 41-42.

---

[2]    The expert's report states that these estimates were computed as the cost to run water to "10+ acre" subdivided lots.  Given that the Property is approximately 176 acres, this could result in seventeen subdivided lots as opposed to the eight proposed by Plaintiffs.  The expert report does not clarify whether the cost to run water to eight lots as opposed to potentially sixteen would vary, and to what extent.  The Court also notes that the record contains only selected excerpts of the expert report.

On July 11, 2022, Plaintiffs filed a petition against the City in the Circuit Court of Jefferson County.  The City then removed the action to this Court on the basis of federal question jurisdiction.  Doc. No. 1.  Plaintiffs allege that the City ordinances coupled with the City's requirement that Plaintiffs pay to extend municipal services has effectively deprived the Trust from any and all economical and productive use and benefit of the Property and its property rights therein.  Doc. No. 1-1 at ¶ 7.

Plaintiffs' petition sets forth three causes of action.  Count I is a Missouri state law claim of inverse condemnation claiming that the City's actions constitute a taking of the Plaintiffs' private property; Count II is a claim of inverse condemnation under the United States Constitution on the same grounds; and Count III is a claim brought under 42 U.S.C. § 1983 claiming Plaintiffs' due process rights have been violated by the actions of the City.  *See id.* at ¶¶ 10-22.  The City filed a motion to dismiss all counts for failure to state a claim.  Doc. No. 2.  The Court denied the dismissal as to Counts I and II and granted the dismissal of Count III, such that the only claims remaining are the state and federal takings claims.  Doc. No. 15.

## ARGUMENTS OF THE PARTIES

Both parties agree that the analysis applicable to Plaintiffs' federal takings claim under Count II is equally applicable to Plaintiffs' state takings claim under Count I pursuant to Article I, Section 26 of the Missouri Constitution and Missouri case law.

## Total Taking

Plaintiffs argue that the City's prohibition of any residence on the Property without paying to extend the City's water system constitutes a *per se* regulatory taking.

- 5 -

Plaintiffs explain that a *per se* or "total" taking occurs when a government regulation results in a physical invasion of property, or the regulation deprives the owner of all economically viable use of their property.  Plaintiffs argue that both circumstances apply here.  First, they argue that the City's ordinance is an effective physical invasion because the ordinance essentially requires that Plaintiffs not only allow the physical construction of an extension of the City's water system on the Property, which will become a permanent physical feature of the Property, but also require Plaintiffs to pay for the costs of that extension.  Second, Plaintiffs argue that the ordinance constitutes a *per se* regulatory taking because it has deprived them of all economically viable use of their land.  Plaintiffs are seeking judgment in the amount of $1,080,000, which is the amount that their expert has opined is the diminution in value of the Property due to the regulations.

The City argues that a *per se* analysis is not applicable here because there has been no physical invasion and Plaintiffs' Property has not been deprived of all economically viable use.  With respect to economic viability of the Property, the City points out that Plaintiffs are not prohibited from developing residential structures, they are simply being asked to pay the costs associated with connecting to the City's water system like all other developers.  The City contends that there is no evidence in the record to support the finding that the Property is worthless without such development.  The City explains that while Plaintiffs' expert opined there was an $1,080,000 diminution in value of the Property, this valuation does not support a finding of a *per se* taking because (1) he did not opine that the Property was worthless, and (2) a diminution in property value alone

does not establish a taking.  The City also contests this valuation because it was based on the alleged cost to run water to all eight lots of the Property, not the cost to run water 228 feet to the edge of Plaintiffs' Property.

**Partial Taking**

Plaintiffs also argue, in the alternative, that the City's regulatory scheme constitutes a compensable partial taking pursuant to *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  Plaintiffs argue that all three *Penn Central* factors—economic impact of the ordinance, investment-backed expectation of the owner, and character of government action—weigh in their favor.  The City disagrees.

### Economic Impact

Plaintiffs argue that the economic impact of the ordinance is significant given that the installation cost alone of the water system extension demanded by the City will exceed $500,000, not including the value of the land which will be consumed in public easements to accommodate the system.  Plaintiffs also cite their expert's appraisal, which determined that diminution in value of the Property was $1,080,000.

The City argues that Plaintiffs cannot put any evidence into the summary judgment record as to the economic impact of the City's ordinances because Plaintiffs have never even asked what it would cost to run water to the edge of the Property.  The City contends that it can run water to within 20 feet of Plaintiffs' property line, and then Plaintiffs would be able to pay to tap on to the City's water supply.  The City further argues that Plaintiffs' economic analysis is improper because it only considers the costs to extend the water system to all of Plaintiffs' proposed subdivided lots.  The City further

explains that it is solely Plaintiffs' preference to subdivide the Property into the eight lots, and no one from the City is mandating that occur.

Additionally, the City argues that the facts of this case indicate that the value of the land is much greater than the alleged cost to comply with its ordinances, even if the Court assumed that the relevant cost was the cost to run the water to all eight proposed lots.  The City notes that Plaintiffs themselves paid nothing for the Property and sold one of the proposed lots in 2021 for $233,825.00, thus assuming similar sales for the other seven proposed lots, the value of the entire property far exceeds the alleged $500,000 or more to run water to all eight lots.  As such, the City contends that the cost to connect to the City's water system does not have a substantial economic impact considering the total value of the land and the future earning capacity of the land.

**Investment-Backed Expectations**

Plaintiffs argue that the Property was purchased by their grandparents as an investment for the family, and the Trust's reasonable expectation was to be able to sell the Property in the future for uses similar to other nearby developments not burdened by the restrictions of the City imposed on the Property.[3]  Further, Plaintiffs argue that the fact that one of the ordinances in question, namely the prohibition against private wells, was in place before the annexation of the Property in the City, does not defeat the Trust's claim.

---

[3]     Although Plaintiffs made this argument, they point to no evidence in the record supporting this contention.

The City argues that Plaintiffs have no investment-backed expectations because they inherited the property and there is no evidence in the record that they spent any money at all on the Property.  The City further argues that the regulations at issue were in place before Plaintiffs inherited the Property; thus, their expectation that they would not be burdened by the restrictions of the City was unreasonable.  To the extent Plaintiffs argue that they or their predecessors had a reasonable expectation when they annexed to the City that the City would pay the costs of extending municipal services, the City argues that any such expectations were mistaken and unreasonable, and not supported by anything in the summary judgment record.

**Character of Government Action**

Lastly, Plaintiffs argue that the character of the government action is the *de facto* exaction of both the installation cost and physical taking of part of the Property for the purpose of extending the City's own water system.  Plaintiffs further contend that there is no overriding public interest here in preventing or abating a nuisance from the construction of single-family homes that might adversely affect the residents of the City.  In sum, the Plaintiffs argue that the City is placing the entire burden of extending its public water system on Plaintiffs when in fairness, that burden should be borne by the City and the City's residents as a whole as with other public improvements and infrastructure.

The City contends that the ordinances at issue are in place for the important government purpose of ensuring that the City's water supply is not contaminated by private wells located in the City limits.  The City further argues that these ordinances are

not forcing Plaintiffs to bear the burden of a public benefit, but like any other developer

or landowner, Plaintiffs are simply being asked to pay the costs to extend the City's water

system to the Property that they themselves want to subdivide into eight lots.  The City

argues that its taxpayers should not have to pay to provide special treatment to Plaintiffs

just so they can make more money on the Property they inherited.

Additional facts and arguments will be discussed in further detail below as

relevant to the parties' specific arguments.

## LEGAL STANDARDS

### Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "[T]he burden of demonstrating there are no genuine issues of

material fact rests on the moving party, and we review the evidence and the inferences

which reasonably may be drawn from the evidence in the light most favorable to the

nonmoving party."  *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015) (citation

omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  In order to demonstrate

a genuine issue of material fact, the opposing party must set forth "specific facts showing

that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253,

270 (1968).  Mere allegations or denials in the non-movant's pleadings will not meet this

burden, not will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  "Where parties file cross-motions for summary judgment, the legal standard does not change.  Each motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law."  *Jaudes v. Progressive Preferred Ins. Co*., 11 F. Supp.3d 943, 947 (E.D. Mo. 2014).

**<u>Takings</u>**

"The Takings Clause of the Fifth Amendment, applicable to the States though the Fourteenth Amendment . . . prohibits the government from taking private property for public use without just compensation."  *Palazzo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897)).  Inverse condemnation is an action by which a property owner seeks compensation for the government's taking of his or her property, where the government has failed to offer reimbursement.  *United States v. Clark*e, 445 U.S. 253, 257 (1980).  Such action is also recognized under the Missouri constitution.  *Page v. Metro. St. Louis Sewer Dist.*, 377 S.W.2d. 348, 354 (Mo. 1964); Mo. Const. Art. I, § 26.  Generally, an inverse condemnation claim involves a physical invasion or intrusion by the government upon private property.  *See Palazzo*, 533 U.S. at 617.  However, a separate species of inverse condemnation claims, regulatory takings, has also been recognized to arise from

excessive regulation by the government, even without any physical invasion.  *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

There are two types of regulatory takings often recognized by the courts.  The first is a *per se* or total regulatory taking where government regulations completely deprive an owner of all economically beneficial use of the property.  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).  The second is a partial taking, which can occur when there is anything less than a complete elimination of value or total loss.  *See Palazzo*, 533 U.S. at 617.  A partial taking requires an ad hoc factual inquiry under the *Penn Central* factors.  *See Palazzo*, 533 U.S. at 617; *Penn Central*, 438 U.S. 104, 124 (1978).

Article I, Section 26 of the Missouri Constitution is the state equivalent of the Fifth Amendment.  It states,

> That private property shall not be taken or damaged for public use without just compensation. Such compensation shall be ascertained by a jury or board of commissioners of not less than three freeholders, in such manner as may be provided by law; and until the same shall be paid to the owner, or into court for the owner, the property shall not be disturbed or the proprietary rights of the owner therein divested. The fee of land taken for railroad purposes without consent of the owner thereof shall remain in such owner subject to the use for which it is taken.

Mo. Const. art. I, § 26.  Missouri Courts analyze takings claims under the same framework provided by the Supreme Court.  *See Clay Cnty. ex rel. Cnty Com'n v. Harley and Susie Bogue, Inc.*, 988 S.W.2d 102 (Mo. Ct. App. 1999); *see  Reagan v. Cnty. of St. Louis*, 211 S.W.3d 104 (Mo. Ct. App. 2006).

# DISCUSSION

## Ripeness

As an initial matter, although the parties do not raise this issue, the record suggests that Plaintiffs' federal claims may not be fully ripe.  "When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City & Cnty. of San Francisco, California*, 141 S.Ct. 2226, 2228 (2021) (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 737 (1997)).  "[T]he finality requirement is relatively modest.  All a plaintiff must show is that 'there [is] no question . . . about how the regulations at issue apply to the particular land in question.'" *Pakdel*, 141 S.Ct. at 2230 (2021) (quoting *Suitum*, 520 U.S. at 739).  The finality requirement is not the same as procedural exhaustion, that is to say that there is no strict administrative exhaustion requirement such that takings plaintiffs are required to fully and properly exhaust administrative procedures before bringing suit.  *See Pakdel*, 141 S.Ct. at 2231; *see Knick v. Twp of Scott, Penn.*, 139 S.Ct. 2162, 2169 (2019).

Here, Plaintiff Becker testified that he had gone to the City multiple times and asked to be allowed to drill a private well, but that he had not received a variance.  He does not expand on whether he officially sought variances or appealed the variance decisions.  But the City does not raise this issue; it only contests that he never asked the City for permission to put in a private well at *his own cost*.  The City has not suggested or indicated that they would allow a well variance or that their decision in this regards is otherwise not final.

Additionally, Plaintiff Becker testified that he spoke with City Council at two open sessions and asked that the Property be de-annexed.  The City suggests that this was not the proper avenue to request de-annexation given that during these open sessions the City Council does not respond to any comments.  Similar to above, there is no indication in the record that the City would consider de-annexation of the Property.  Given that neither party raised this issue, it appears the parties agree that the there is no question about how the regulations apply to the Property, and the finality requirement has been satisfied.  *See Pakdel*, 141 S.Ct. at 2230.  As such, the Court will consider Plaintiffs' federal takings claim to be ripe for adjudication.[4]

### *Per Se* **Taking**

Plaintiffs allege that the City's regulations constitute a *per se* taking because they require an effective physical invasion of the Property, and the regulations deprive Plaintiffs of any economically viable use of the Property.

---

[4]     The Court also recognizes that the regulations at issue may have been properly characterized as an exaction, which calls for a separate analysis pursuant to *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).  An exaction occurs when a governmental entity requires an action by a landowner, including the payment of money, as a condition to obtain governmental approval of a requested land development.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013).  An exaction is not compensable where there is a "'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use."  *Id*. at 599.  Typically, exaction cases involve conditions placed on building permits which is not at issue here.  Additionally, neither party asserts that the regulations here constitute an exaction.  In fact, Plaintiffs affirmatively argue (and the City does not dispute) that the regulations are *not* an exaction.  See Doc. No. 37 at 7.  As such, the Court will not address this analysis, and will analyze Plaintiffs' claims under the standards applicable to per se and partial takings.

**Physical Invasion**

A physical taking occurs when **"**when the government encroaches upon or occupies private land for its own proposed use." *Palazzo*, 533 U.S. at 617.  This "permanent physical occupation of property" is considered a taking "to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982).  The *Loretto* court also recognized that permanent occupations of land by installations such as telephone lines, rails, or underground pipes or wires are takings "even if they occupy only relatively insubstantial amounts of space and do not substantially interfere with the landowner's use of the rest of his land." *Id.* at 430 (citations omitted).   A physical taking has also been found where the government requires private landowners to dedicate a portion of their land solely for government benefit.  *See Horne v. Dep't of Agric.*, 576 U.S. 351 (2015) (finding that a government requirement that raisin growers set aside a percentage of their crop of the benefit of the government was a taking.)

The regulations at issue do not involve or require a physical encroachment, rather they regulate the *use* of the property by requiring all residential structures in City limits to be "serviced by the city water supply system or by an approved and functioning deep well."  Doc. No. 40-5.  The *Loretto* court was very clear that its holding applied only to permanent physical occupations of property, and not regulations on *use* of property. *Loretto*, 458 U.S. at 441 ("Our holding today is very narrow.  We affirm the traditional rule that a permanent physical occupation of property is a taking . . . .  We do not,

- 15 -

however, question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property.").

To be clear, the City has in no way actually physically encroached on the Property. Rather, Plaintiffs argue that the City's regulations require Plaintiffs to allow the physical construction of an extension of the City's water system on the Property, which will become a permanent physical feature of the Property and must thereafter be dedicated to the City.  There is simply no evidence in the record that the City requires any sort of physical encroachment onto Plaintiffs' private property in order to extend the water system.  Rather, the City representative testified, and the Plaintiffs do not dispute, that the City has the ability to extend the water system to *within* 20 feet of Plaintiffs' property line and then Plaintiffs would be able to tap into it.  Jesse Wallis Dep., Doc. No. 40-8 at 35:14-17.  Additionally, a physical taking occurs when government occupies private land for its *own* proposed use.  *See Palazzo*, 533 U.S. at 617.  So even if there was some sort of physical encroachment required here, the water lines would be for the property owners' private use of water at their private residences.  In short, the record demonstrates that the issue here is not a physical invasion but whether the City's regulations impermissibly restrict the *use* of Plaintiffs' property to the extent that a taking has occurred.

**No Economically Viable Use**

Plaintiffs also argue that, regardless of any physical invasion, the City's regulations constitute a *per se* regulatory taking because the regulations have deprived Plaintiffs of all economical use of the Property.  A *per se* or total regulatory taking occurs

when a regulation "denies all economically beneficial or productive use or land." *Lucas*, 505 U.S. at 1015.  This is not the case here.  The regulations do not preclude all development and force the Property to remain vacant, idle, and bereft of any economic value. *See Lucas*, 505 U.S. at 1019.  The regulations simply require Plaintiffs to hook up to the City's water lines, at their own cost, in order to lawfully occupy a residential structure.  While these costs may decrease the property value of the Property, they do not render it useless or valueless. *See Penn Central*, 438 U.S. at 131 ("Diminution in property value alone, however, does not establish a taking.")

Notably, Plaintiffs' expert did not opine that the Property was rendered valueless by the City's ordinances. *See* Clint Cooper Affidavit, Doc. No. 36-6; Cooper Expert Report, Doc. No. 44-3.  The expert's affidavit stated that the highest and best use of the Property (subdividing it into 10+ acre lots) would be economically unfeasible for Plaintiffs given the cost to extend water to every single lot.  Doc. No. 36-6 at ¶ 3.  Yet, his expert report noted a range in costs, and explained that only when that cost reached $1,080,000 would the cost surpass the Property's market value.  Doc. No. 44-3 at 3.  His report also noted that under the best-case scenario with respect to extension costs, the Property would retain a value of $587,000. *Id.*  He further opined that even if the cost of extension exceeded $1,080,000, the Property would still retain value as recreational land in the amount of $470,000. *Id.*[5]  Accordingly, Plaintiffs have failed to demonstrate that

---

[5]     The Court notes that the financial analysis provided by Plaintiffs is considerably limited and fails to consider a number of alternative scenarios, such as the cost to extend water to one point on the Property where a residence or two could be built.  These issues are discussed in further detail below.

that the regulations preclude *all* economic use of their Property, and their own evidence confirms that any such contention is unfounded.

As such, the Court finds that the City's regulations do not constitute a categorical or *per se* taking.  Anything less than a "complete elimination of value" or a "total loss" is not a categorical taking and requires a *Penn Central* analysis.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (quoting *Lucas*, 505 U.S. at 1019-20, n. 8); *see also Palazzo*, 533 U.S. at 616, 631 (finding that regulations which decreased land value by 93% was not sufficient to trigger *Lucas's per se* treatment).  Therefore, the Court will proceed with its analysis under *Penn Central*.

**Partial Taking**

"Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors."  *Palazzo*, 533 U.S. at 617.  These factors, often described as the *Penn Central* factors, are: (1) economic impact of the regulation on the landowner; (2) the regulation's impact with the owners' reasonable investment-backed expectations; and (3) the character of the government action.  *Penn Central*, 438 U.S. at 124.  These factors are neither exclusive, nor even mandatory, but have "particular significance" in what are considered takings' "essentially ad hoc, factual inquiries."  *Id.*  "The Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The *Penn Central* court explained that while the enumerated factors have particular significance in our inquiry,

there is no "'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionally concentrated on a few persons."  *Penn Central*, 438 U.S. at 124.

### Economic Impact

There is a "heavy burden placed upon one alleging a regulatory taking," and Plaintiffs must show a "deprivation significant enough to satisfy this heavy burden." *Keyston Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987).  Further, evidence of economic impact cannot be too speculative.  *See In re Jones Truck Lines, Inc.*, 57 F.3d 642, 651 (8th Cir. 1995) (finding that economic impact was too speculative to support a takings claims); *see Maine Educ. Ass'n Benefits v. Cioppa*, 695 F.3d 145 (1st Cir. 2012) (holding that economic impact evidence was conjectural in nature and the plaintiff failed to demonstrate that the economic impact was sufficiently concrete to establish a regulatory taking); *see Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 (6th Cir. 2009) (finding the economic impact of the challenged regulation did not support the movant's takings claim, in part because "the [economic] impact [of the regulation was] speculative.").

Plaintiffs' economic impact evidence is incomplete and speculative.  While it is likely that the value of the land will decrease if Plaintiffs are required to pay the costs to extend City water services, the extent of that decrease is uncertain.  Plaintiffs claim a $1,080,000 diminution in value, but that value *assumes* the Property was subdivided into 10+ acre lots, the purported "highest and best use" of the property, with water extended

to every individual lot.  Plaintiffs' expert stated that it would be "economically unfeasible" to develop the Property to this extent given the costs to extend the water system.  The expert report notes that the market value of the land without the regulations (i.e., if Plaintiffs would be permitted to dig wells) is $1,550,000, whereas the market value, assuming the development of 10+ acre lots, with the regulations would range from $587,000 to $0.  Doc. No. 44-3.  These calculations are based on the premise that it would cost $180-$280 per linear foot to extend the water lines and the water lines would have to be initially extended either 1,750 or 2,220 feet to reach the edge of the Property.  *Id.*

However, this calculation fails to take into consideration the undisputed fact that it would only be 228 feet for the City to extend water services to the edge of the Property from the neighboring Eagle Rock Subdivision.  Doc. No. 41-8 at 53:20.  This figure significantly impacts the cost analysis.  Plaintiffs' analysis estimated that it would be 1,750 feet or 2,220 feet just to extend the water system to the edge of the Property, which even at the maximum price of $280 per linear foot, results in costs of $490,000 and $616,000, respectively.  Whereas the cost to extend 228 feet to the edge of the Property at the maximum price of $280 per linear foot is only $63,840.[6]  This is a significant variation that is not accounted for in Plaintiffs' analysis.

---

[6]     The Court is not suggesting that these calculations are the correct economic analysis, but these figures illustrate the variability in Plaintiffs' economic impact analysis.  The Court is mindful that these figures may be impacted by additional costs such as the costs to obtain easements in the Eagle Rock subdivision.  However, like many other factors, such costs are not included in the record and were not considered in Plaintiffs' analysis.

Additionally, as briefly mentioned above, the expert analysis only states that the costs were evaluated at the price to extend to individual 10+ acre lots.  The expert report did not explain whether the cost to extend would vary depending on the number subdivided lots.

Further, the Court is not convinced that the correct economic impact analysis is the cost to extend to every proposed subdivided lot as opposed to the cost to extend to the Property as a whole parcel, which is its present state.  Notably, the remaining Property has not been legally subdivided, and it is Plaintiffs' own decision to subdivide their Property in order to maximize their selling ability.  The Property was annexed into the City as a whole parcel, and legally remains a whole parcel.  As such, the economic impact is likely more fairly evaluated as the cost to extend to the Property as a whole (i.e. the cost to extend to one point).  The record indicates that the cost to extend the water line to one point on the property (as opposed to the eight proposed by Plaintiffs) is considerably less costly.  Yet Plaintiffs have presented no calculations on the economic impact to extend to one portion of the Property where a residence or two could be built and legally occupied.

The City does not dispute that the highest and best use of the Property may be to subdivide it into 10+ acre lots to be sold for residential development.  But a regulation is not a taking merely because it prohibits the highest and best use of a property.  *See Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590,592-93 (1962) ("If [the] ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional"); *see also*

*Kabrovski v. City of Rochester, N.Y.*, 149 F. Supp. 3d 413, 425 (W.D.N.Y 2015) ("[I]t is well settled that a "taking" does not occur merely because a property owner is prevented from making the most financially beneficial use of a property."). The mere fact that Plaintiffs cannot maximize their profits by subdividing their Property into multiple lots does not support the conclusion that a regulatory taking has occurred.

In any event, regardless of whether the economic impact is evaluated from the cost to extend to multiple points on the Property or from one point on the Property, the evidence of economic impact is too speculative. In sum, on this record, Plaintiffs have not presented sufficient concrete evidence for a reasonable factfinder to sufficiently determine the economic impact of the regulations. As Plaintiffs have failed to meet their burden of demonstrating a significant economic impact, this factor thus weighs in favor of the City.

### Investment-Backed Expectations

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005-06 (1984) (citation omitted). Plaintiffs claim that they, and their predecessors, had a reasonable expectation to sell the Property for uses similar to other nearby developments not burdened by the restrictions of the City imposed on the Property. The City argues that Plaintiffs have no investment-backed expectations as there is no evidence in the record that they spent any money on the Property at all, and when Plaintiffs inherited this land, the City regulations were already in place and the Property was zoned residential.

As an initial matter, the fact that Plaintiffs inherited the Property rather than purchased it is not dispositive in the investment-backed expectations analysis. *See Palazzo*, 533 U.S. at 635 ("We also have never held that a takings claim is defeated simply on account of the lack of personal financial investment by a postenactment acquirer of property, such as a donee, heir or devisee.") (O'Connor concurring).

Further, a takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Id.* at 632. However, that "does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis. Indeed it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance." *Id.* at 633 (O'Connor concurring). "A reasonable restriction that predates a landowner's acquisition, however, can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Murr v. Wisconsin*, 137 S.Ct. 1933, 1945 (2017).

Here, Plaintiffs assert that the Property was purchased by their grandparents in 1948 and placed in the trust as an investment property. It has never been used or occupied to date. While Plaintiffs assert there was a reasonable expectation that the Property would be able to be developed without being burdened by the restrictions of the City, there is no such evidence of this in the record. Moreover, this expectation was necessarily altered when Plaintiffs' predecessors *voluntarily* annexed the Property into the City in 2000 and chose to be subject to the City's regulations, including the ordinance prohibiting private wells which had already been in place for nearly 30 years. The

Property was perfectly free to remain in Jefferson County where Plaintiffs allege private wells are commonplace, but the Trust affirmatively chose to join the City and be subject to its laws.  Whether or not Plaintiffs' predecessors knew of the well prohibition at the time of annexation is immaterial to this analysis; ignorance of the law is not an excuse. In this same vein, Plaintiffs also claim that they have recently incurred expenses to divide and market the Property as large lots and paid a real estate commission to their agent in connection with the sale of Lot 8, believing that the buyer would be able to construct a home with a private well.  However, this was not a reasonable belief.  Plaintiffs' failure to conduct any due diligence as to what ordinances applied to their Property before incurring these expenses was not reasonable.

To the extent that Plaintiffs' expectation was for water to be furnished to all eight proposed subdivided lots at the City's expense, such expectation is also unreasonable. All other developers and those wishing to connect to the City's water supply have paid the connection costs.  In fact, when the neighboring property owner, direct west of Plaintiffs' Property, decided to develop his property into a subdivision, the developer paid the costs to extend the City's water system to his Property.  The City has also had two instances in the past where individuals who lived outside the City limits wanted to tap into the City's water system, which the City allowed them to do so long as the property owners paid the costs of extension.[7]

---

[7]     Indeed, it appears from the excerpt of Plaintiffs' expert report that the cost to extend the water approximately 3,400 feet along Lake Wauwanoka Road, presumably to accommodate subdivided lots, far exceeds the cost to bring water to the Property.

"[U]nilateral expectations, no matter how adamantly pursued, are not enough . . . .
The expectation must be a reasonable one." *Cioppa*, 695 F.3d at 156 (1st Cir. 2012)
(citing *Monsanto*, 467 U.S. at 1005-06).  It is simply not reasonable to expect the City,
and its taxpayers to pay the cost to extend water services to every single point on a
property that an owner unilaterally decides to subdivide in order to maximize profit.

Again, the fact that Plaintiffs acquired the Property after the enactment of relevant
ordinances is not dispositive.  But the totality of the circumstances here, including that
the Property was voluntarily annexed and all other developers and those wishing to
connect to the City's water supply have paid the connection costs, cause this factor also
to weigh in favor of the City.

### Character of Government Conduct

With respect to the final factor, the parties dispute the true character of the City's
prohibition on drilling wells.[8]  This ordinance was enacted in 1971, and it is not apparent
from the text of the ordinance or the bill which passed such ordinance why the City
decided to prohibit the drilling of private wells.  The City's representative, Jesse Wallis,
testified that while he did not definitively know why the City enacted this ordinance in
1971, he assumed it was to protect the City's water supply from contamination.  He
explained that "[if] you look at any other water district around you'll notice a lot of them
do not allow wells to be drilled in their districts  . . . because they supply the water."

---

[8]     The parties do not dispute the purpose of Ordinance Section 23-73, which prohibits
residential occupancy without a proper source of water, for it is apparent from its face that
this ordinance promotes "the health, safety, morals, or general welfare" of its citizens.  *See
Penn Central*, 438 U.S. at 125.

Doc. No. 44-1 at 20:12-18.  When asked whether the water districts to prohibit wells in order to be the exclusive provider of the water,  Wallis stated,

> I think there's some of that and I also believe there's other, as far as maintaining the samples and the water table that you're getting your water from, there's more control over, you know, what's going in the ground, you know, you don't have the possibility of open wells within your system putting contamination into the water table.

*Id.* at 20:24-21-6.  The City's corporate representative, Adam Wells, also noted that the prohibition of wells is in part a conservation consideration as it protects the depletion of the aquifer.  Wells Dep., Doc. No. 44-2, at 27:8-17.  In instances in which it has been "reasonably concluded that "'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the Supreme Court] has upheld land-use regulation that destroyed or adversely affected recognized real property interests."  *Penn Central*, 438 U.S. at 125 (citing cases).  Plaintiffs here have not controverted the City's evidence that a government prohibition against the drilling of private wells inside the city limits protects its water supply from contamination, and such a restriction would promote the health, safety, and general welfare of its citizens.  Even if such prohibition was motivated in part by the economic benefits of being the exclusive water supplier, the fact that the ordinance incidentally promotes health and safety cannot be wholly disregarded.  Regardless, even if the Court were to consider this factor to be neutral on balance, or even weighing slightly in favor of Plaintiffs, Plaintiffs still would not be able to demonstrate a taking in light of the other factors and the record as a whole.

    In short, even viewing the record and all reasonable inferences in the light most favorable to Plaintiffs, no rational trier of fact could find that a partial taking occurred

here.  As discussed above, the *Penn Central* factors are neither mandatory nor exclusive, and the heart of a takings' inquiry is whether justice and fairness require compensation. Here, the Trust voluntarily annexed the Property into the City in 2000, thereby voluntarily subjecting the Property to the City's zoning and land use restrictions. Although the decision to annex may have been an unfortunate financial decision in hindsight given how far the Property is located from the City's water system, Plaintiffs have not met their burden to establish that the City is responsible for bearing the consequences.[9]

The Court recognizes that the regulations themselves must still be constitutional. Plaintiffs have not cited to any cases which have found similar regulations to be unconstitutional; nor does the takings' jurisprudence suggest that requiring property owners to pay for the cost of extending city services to their property when they choose to develop it is inherently unreasonable, much less unconstitutional.  Indeed, other jurisdictions have conclusively found that government requirements to pay extension fees are not takings.  *See Town Council of New Harmony v. Parker*, 726 N.E.2d 1217, 1226 (Ind. 2000), amended on reh'g in part, 737 N.E.2d 719 (Ind. 2000) (explaining that "certain services, such as fire and police protection, have traditionally been provided to all citizens of a municipality, financed through property taxes. [And] certain other services, such as water, sewer, gas, electric, and roads, were traditionally thought of as proprietary and are still largely provided through assessments to the landowners of the

---

[9]     As set forth above, it is unclear what the City's response would be if Plaintiffs formally requested de-annexation in the proper forum.

parcels benefiting from the installation of utilities."); *see also Boles v. Town of Oak Island*, 837 S.E.2d 871, 872 (N.C. 2020) (finding that fee assessed in accordance with extending town sewer system to undeveloped properties was not a taking because it was a reasonable user fee) (citing *United States v. Sperry Corp.*, 493 U.S. 52, 63 (1989) ("[A] reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services.").  There is nothing in the record to suggest that the City's request that Plaintiffs pay the costs to extend water services to their Property is anything other than a reasonable user fee.

## CONCLUSION

In consideration of the record as a whole, including all of Plaintiffs' well-supported evidence and arguments, no reasonable fact finder could conclude that the regulations at issue here constitute a taking under federal or state law.[10]

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for summary judgment is **DENIED**.  Doc. No. 35.

**IT IS FURTHER ORDERED** that Defendant City of Hillsboro's motion for summary judgment is **GRANTED**.  Doc. No. 38.

---

[10]    Given the complete overlap of the legal analysis here, the Court will exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and rule on both the federal and state claims.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 17th day of October, 2023.